This time we'll hear Johnstone v. The Village of Monticello. Good morning. May it please the Court, Stephen Bergstein for the Plaintiff Appellant. The complaint states a plausible claim for a racially hostile work environment where the mayor of the Village of Monticello launched a profane racial tirade against the plaintiff and threatened his job in the course of that tirade. This occurred at the police station? This was at the police station. The plaintiff is a police officer. He arrested the mayor for DWI. The mayor launched this tirade. According to the State Division of Human Rights, it was an intermittent tirade lasting about three to four hours. The mayor was locked up at the time, right? Correct. He'd been picked up on a DUI. Would you say that he was, in launching this tirade, acting in his capacity as mayor? Or was he acting in his capacity as a teed-off RSD who was very, very upset at the whole set of circumstances? Both. I mean, isn't this the kind of thing that officers get all the time when they pick up drunken people who don't particularly like the fact that they've been arrested? If it's John Q. Public, that's one thing. You're saying he was wearing his mayor's hat as opposed to his teed-off citizen's hat at this point? Both, because it was the mayor. You can't ignore the fact that it's the mayor, and that's who has authority over everybody's employment, and he's making threats about their job status. I mean, what sort of authority did he have when he was behind bars? That seems to me to be a non-second. What authority? To regulate their employment? Yeah. Well, he's threatening to do it in the future. It is the mayor. I mean, the mayor might be handcuffed to the wall, but if he says, look, you're all going to be suspended, you can forget about your future here, that's coming from a person who has authority to actually fulfill it as opposed to somebody off the street who's just blowing steam because he's unhappy that he was arrested. That's what makes this case unique. Yes, he was arrested as a citizen, not as the mayor, but he happens to be the mayor saying these things, and it makes a difference. And on a Rule 12, you know, we look at some of the language this court uses to determine whether there's a hostile work environment, altering the work environment. Is there any evidence at all that there was any follow-up to this so-called threat, or even that the mayor remembered it the next day? Well, no, we don't have evidence that he followed up on his threat, and in fact, sometime later on it was the mayor who lost his job for other reasons. But I don't think that really matters because at the time you're there and you know he has the authority to make good on these promises or these threats. And if you look at the language this court uses in determining if there's a hostile environment, altering the work environment for the worse, working a transformation of the plaintiff's workplace, undermining. . . The work environment that this guy was in, that your client was in, involved a lot of hostility generally. I mean, that's the nature of being a policeman. Not everybody is docile when the police make an arrest and when they lock people up. So I don't know how the work environment changed because of this. Well, again, John Q. Public, that's part of the job. From the mayor, that's a work problem, and it undermines the plaintiff's authority in the workplace. That's another standard this court uses in determining if there's a hostile environment. The key fact in this case, I think, is the fact that it was the mayor. And although it wasn't during nine to five business hours, he's still the mayor. He's saying these things. He has control over the plaintiff's employment, and it was a racial tirade. And on a Rule 12, I think we can say there's a plausible claim for a hostile environment. Thank you. Thank you. Good morning. I'm Stephen Gabber for the Appalese. I know the tirade took place over the course of roughly four hours. In fact, the plaintiff left before the mayor was done saying what he had to say. Nevertheless, it constitutes a single instance, and the cases are foursquare that a single instance, as a general rule, will not give rise to a Title VII claim or even a 1983 claim for a hostile work environment. There are exceptions. Exactly. There are exceptions, but the exceptions are fairly narrowly circumscribed. It has to be extremely severe, the single instance, and it has to be in the context of being extremely severe, such that in and of itself it can and does transform the plaintiff's workplace. That simply didn't happen in this instance. There was a single instance, as I said, but the plaintiff's workplace was exactly the same before and after.  Couldn't he reasonably worry from day to day thereafter that the mayor will make good on these threats and operate under a cloud that doesn't exist if anybody else carries on when they're arrested for DUI? Well, Your Honor, perhaps if there were allegations in the complaint that the plaintiff was in fact subjectively worried, that in fact he suffered some psychological trauma, that in fact his work became burdensome, onerous, difficult, he was disheartened, something like that perhaps maybe an inference might be. There's nothing like that in the complaint. You're conceding a lot. After the incident, was there any evidence at all as to the mayor's attitude towards the plaintiff? The incident never was even mentioned again. There's absolutely no proof of that, no allegation. The Division of Human Rights decision indicates there was absolutely nothing. The issue was never even raised. As I think the Court indicated, the mayor may not have even remembered in the morning. I mean, it simply had nothing to do. It was a one-time outburst. And if you look at the overall, the totality of the circumstances here, I mean, there's no physical threat. There's no — there's nothing — I mean, while offensive, the statements were not particularly humiliating. This was a blunderbrust statement leveled at everyone and anyone who came in, white, black, it didn't matter. The mayor was alleging that he was the victim, and that was the context in which these — and that's clear from the pleadings. This wasn't where the plaintiff was singled out and demeaned because of Rice. This was just a senseless tirade by the mayor while he was under arrest, handcuffed to a bench on DWI charges. It simply isn't the type of extremely severe incident that might give rise to a hostile work environment claim. And as I said, there's no allegations of any change in the workplace whatsoever, much less that it was caused by this particular incident. No allegations of psychological harm. I just don't think it's the type of claim that you can equate with the cases in which the court has found that a single incident might give rise to a claim. The other argument, if I could just touch on briefly, that we'd like to raise, is that even in the event that somehow it could be found that the Title VII claim is plausibly pled, the 1983 claim nevertheless should have been dismissed on the grounds of collateral estoppel. While a Title VII claim will not be collaterally estopped to be asserted based on an administrative determination, the same is not true for a 1983 claim. The administrative determination is entitled to more than just substantive weight. It actually can result in dismissal of the claim based on collateral estoppel. Now, I know there aren't many cases in which that actually occurred, but I would submit that our case is different. And the reason our case is different is because this entire event was captured on film, on tape. And that tape was submitted to the New York State Division of Human Rights. And that tape was viewed at a hearing in which the plaintiff was represented by counsel, witnesses were called, there was a right to examine and cross-examine witnesses, and a propensity, or rather a fair preponderance of the evidence standard was applied in the Division of Human Rights coming with a decision that there was no hostile workplace established in this case. On those facts, the facts of this case, we would submit that the 1983 claim is barred on the grounds of collateral estoppel. Unless the Court has any questions. Thank you. Thank you. On the hostile environment, what we just heard was a good summation were this case to go to trial, drawing inferences favorable to the employer. It was a blunderbuss attack, no psychologicals, may or may not have remembered. Okay. The attack was consistent of epithets and comments racist, cracker, so forth, and member of the KKK, Nazi. And it wasn't just directed at your client. It was directed at anybody who was there, all the police, right? Correct. So that can help the plaintiff's case. He's being subjected to all of these epithets, but they were also directed at him. On the collateral estoppel, one reason they don't get collateral estoppel is that they don't have an identity of issue. The State Division didn't really apply federal law. It articulated the standard as severe and pervasive. That's not the standard under Title VII in this circuit or the Supreme Court, severe or pervasive. So once you have the wrong standard, it's like a bad jury instruction. It taints the outcome. The State Division did not seem to recognize that a one-time isolated incident can create a hostile work environment. It said, again, it said it wasn't pervasive enough. There was not an evidentiary hearing the way we typically have evidentiary hearings at the State Division with an ALJ. It was a fact-finding conference, and there was review. But this Court said in Cossico that State Division hearings are not quite like federal actions. You don't have depositions. You don't have document review. And so the collateral estoppel argument, which is limited to the 1983, shouldn't work here. Thank you. Thank you both. We will reserve decision.